987 P.2d 268

STATE of Hawai'i, Plaintiff–Appellant,

v.

Edward Bailey WILSON, Jr.,
Defendant–Appellee.

No. 21707.

Supreme Court of Hawai'i.

Oct. 28, 1999.

Georgia McMillen, Deputy Prosecuting Attorney, for plaintiff-appellant.

Richard L. Rost (James W. Geiger with him, on the brief), Wailuku, for defendant-appellee.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by KLEIN, J.

This appeal arises from the criminal prosecution of defendant-appellee Edward Bailey Wilson, Jr. (Wilson) for, *inter alia*, driving under the influence of intoxicating liquor (DUI). Plaintiff-appellant State of Hawai'i (the prosecution) appeals from the June 25, 1998 order of the district court of the second circuit granting Wilson's motion to suppress the results of the blood alcohol test taken after his arrest on November 10, 1997. On appeal, the prosecution argues that the district court erred in suppressing the blood test results because: (1) sanctions under the administrative driver's license revocation law do not apply in criminal DUI proceedings; and (2) Wilson validly consented to a blood alcohol test insofar as the arresting officer's statement expressly warned Wilson of the possibility of criminal prosecution.

Because the information conveyed to Wilson regarding his rights under Hawai'i Revised Statutes (HRS) chapter 286 was inaccurate and misleading, we hold that Wilson was precluded from making a knowing and intelligent decision whether or not to submit to the evidentiary blood alcohol test, in violation of HRS chapter 286. Accordingly, we affirm the district court's order granting Wilson's motion to suppress the blood test results in his criminal DUI prosecution.

## I. BACKGROUND

On December 5, 1997, Wilson was charged by criminal complaint with one count of DUI, in violation of HRS § 291-4 (1993).[1] The complaint also charged Wilson with one count of disregarding longitudinal traffic markings, in violation of HRS § 291C-38 (1993).

On March 13, 1998, Wilson filed a motion to suppress the results of the blood test that he took after his arrest on November 10, 1997. On May 29, 1998, the district court heard the motion. Wilson, through his attorney, stated that "for the purposes of the facts of this case, [the prosecution] and I are going to stipulate that we believe the arresting officer in this case read the sanctions under [HRS] chapter 286 as stated in the form that they use." That "form," the "sworn statement of arresting officer," issued by the state Administrative Driver's License Revocation Office (ADLRO), reads in relevant part:[2]

1. HRS § 291-4 provides in pertinent part:

   **Driving under the influence of intoxicating liquor.** (a) A person commits the offense of driving under the influence of intoxicating liquor if:
   (1) The person operates or assumes actual physical control of the operation of any vehicle while under the influence of intoxicating liquor, meaning that the person concerned is under the influence of intoxicating liquor in an amount sufficient to impair the person's normal mental faculties or ability to care for oneself and guard against casualty; or
   (2) The person operates or assumes actual physical control of the operation of any vehicle with .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood or .08 or more grams of alcohol per two hundred ten liters of breath.

2. Although the prosecution, in its memorandum in opposition to Wilson's motion to suppress, stated that the sworn statement is "herewith

Pursuant to the Administrative Driver License Revocation Law, I must inform you (arrestee) of the following:

a. That you may take either a blood test or breath test or both;

b. That if you refuse to take any tests the consequences are as follows: (1) if your driving record shows no prior alcohol enforcement contacts during the five years preceeding [sic] the date of arrest, your driving privileges will be revoked for one year *instead of the three month revocation that would apply if you chose to take the test and failed it* [; and]

c. That criminal charges under Sec. 291–4 HRS, may be filed[.]

(Emphasis added.)

In his motion, Wilson objected to the representation in the arresting officer's statement that a person who consented to the blood test and failed it would have his or her driving privileges revoked for only three months. Citing our decision in *Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 931 P.2d 580 (1997), Wilson pointed out that, as someone who consented to the test and failed it, he in fact faced the possibility of revocation of his driving privileges

under HRS § 286–261(b) (Supp.1998) [3] anywhere from three months to one year.[4] Therefore, insofar as the arresting officer misstated the legal consequences of consent, Wilson argued that "[his] consent was not freely given and his constitutional rights to due process of law have been violated. The taking of his blood constitutes an unlawful search and the results of the test must be suppressed."

At the hearing, the district court granted Wilson's motion. The hearing transcript reads in relevant part:

THE COURT: ... [W]hat we're talking about here is the matter of the possibility that he could take the test, fail it, and still get a year, which is a possibility under the law. Am I correct there, [defense counsel]?

[DEFENSE COUNSEL]: Yes, Your Honor. That's what Gray says.

THE COURT: All right. That being the case, I don't think he was properly advised. I'm going to grant the motion.

The court's order, filed on June 25, 1998, states in relevant part:

1. Defendant was erroneously advised of the sanctions under Part XIV (*H.R.S.*,

---

attached as Exhibit A," the form in fact appears nowhere in the record. At the hearing, however, the parties stipulated that the arresting officer read her statement from the standard "sworn statement of arresting officer" form, and the district court apparently accepted the form into evidence and discussed its contents at length with the parties. Therefore, although Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(9) states that "[a]nything that is not part of the record shall not be appended to the brief," we deem the form submitted by the prosecution as "appendix A" in its opening brief on appeal, to which Wilson does not object, as representative of the form that the district court considered at the hearing on Wilson's motion to suppress.

3. HRS § 286–261(b) states in relevant part:
The periods of administrative revocation which may be imposed under this part are as follows:
(1) Three months, if the arrestee's driving record shows no prior alcohol enforcement contacts during the five years preceding the date of arrest;
(2) One year if the arrestee's driving record shows one prior alcohol enforcement contact during the five years preceding the date of arrest;

(3) Two years if the arrestee's driving record shows two prior alcohol enforcement contacts during the seven years preceding the date of arrest; [or]
(4) For life if the arrestee's driving record shows three or more prior alcohol enforcement contacts during the ten years preceding the date of arrest[.]
HRS § 286–261(c) (Supp.1998) states:
The license of an arrestee who refuses to be tested after being informed of the sanctions of this part shall be revoked under subsection (b)(1),(2), and (3) for a period of one year, two years, and four years, respectively.

4. In *Gray*, we interpreted HRS § 286–261(b) as granting the ADLRO the discretion to increase the stated minimum periods of revocation for "non-refusing" arrestees, but "capping" this discretionary revocation by the mandatory periods of revocation for "refusing" arrestees enumerated in HRS § 286–261(c). *See Gray*, 84 Hawai'i at 160–61, 931 P.2d at 602–03. According to this rubric, the minimum period of revocation for an arrestee without a prior enforcement record who consents to the test and fails is three months and the maximum period is one year.

Chapter 286–251 et. seq.) by the arresting officer.

2. Defendant's consent for a test of his blood was therefore not obtained.

3. The blood test result of Defendant's blood is hereby suppressed for use as evidence in this case.

The prosecution timely appealed.

## II. STANDARD OF REVIEW

We review a circuit court's findings of fact in a pretrial ruling according to the following standard:

> Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.

*State v. Okumura,* 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citations and internal quotation marks omitted). "The circuit court's conclusions of law are reviewed under the right/wrong standard." *State v. Pattioay,* 78 Hawai'i 455, 459, 896 P.2d 911, 915 (1995) (citation omitted). Furthermore,

> in a case such as the one at bar, the proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his [or her] own Fourth Amendment rights were violated by the search and seizure sought to be challenged.

*State v. Abordo,* 61 Haw. 117, 120–21, 596 P.2d 773, 775 (1979) (citation and footnote omitted). The proponent of the motion to suppress must satisfy this "burden of proof

by a preponderance of the evidence[.]" *Pattioay,* 78 Hawai'i at 466, 896 P.2d at 922 (citation omitted).

*State v. Anderson,* 84 Hawai'i 462, 466–67, 935 P.2d 1007, 1011–1012 (1997) (emphases omitted).

## III. DISCUSSION

A. *Because The Arresting Officer Inadequately Advised Wilson of the Applicable Administrative Penalties Under HRS chapter 286, Wilson Did Not Knowingly and Intelligently Consent to a Blood Test, in Violation of HRS chapter 286.*

The prosecution argues that the district court erred in suppressing Wilson's blood alcohol test results because (1) sanctions under ADLRO do not apply in criminal DUI proceedings; and (2) Wilson voluntarily and intelligently consented to the blood test insofar as the arresting officer's statement warned Wilson of the possibility of criminal prosecution. With respect to both contentions, we disagree.

■ Under HRS § 286–151(a) (Supp. 1998),[5]

> [a]ny person who operates a motor vehicle . . . on the public highways of the State shall be deemed to have given consent, subject to this part, to a test or tests . . . of the person's breath, blood, or urine for the purpose of determining alcohol concentration or drug content of the person's breath, blood, or urine[.]"

(Citation omitted.) Under this "implied consent" scheme, when a person is arrested for violation of HRS § 291–4, the arresting officer must, *inter alia,* "take possession of any license held by the person and request the arrestee to take a test for concentration of alcohol in the blood." HRS § 286–255(a)

---

5. HRS § 286–151 further provides in relevant part:

    . . . .

    (b) The test or tests shall be administered at the request of a police officer having probable cause to believe the person driving or in actual physical control of a motor vehicle or moped upon the public highways is under the influ-

ence of intoxicating liquor or drugs, . . . only after:

    (1) A lawful arrest; and

    (2) *The person has been informed by a police officer of the sanctions under part XIV and sections 286–151.5 and 286–157.3.*

(Emphasis added.)

(Supp.1998).[6] Upon informing the arrestee of his or her choice of taking a breath test, blood test, or both, "[t]he arresting officer *shall* also inform the person of the sanctions under this part, including the sanction for refusing to take a breath or a blood test." *See id.* (emphasis added). HRS § 286–151 likewise requires that "the test or tests shall be administered … *only after* … [t]he person has been informed by a police officer of the sanctions under part XIV and sections 286–151.5 and 286–157.3." (Emphasis added.) Thus, as the statutory language makes clear, a driver's "implied consent" to an evidentiary chemical alcohol test is qualified by his or her implied right to refuse such a test after being accurately informed of his or her statutory right to consent or refuse, as well as the consequences of such consent or refusal.

HRS § 286–261(b) specifies the applicable periods of time an arrestee's license may be administratively revoked upon the arrestee's consent to a blood alcohol test. *See supra* note 4. In *Gray, supra,* we held that HRS § 286–261(b) grants the ADLRO the discretion to increase the minimum periods of administrative revocation for "non-refusing" arrestees. *Id.* at 160, 931 P.2d at 602. This discretionary authority under HRS § 286–262(b) is "capped" by the mandatory periods of revocation for "refusing" arrestees under HRS § 286–261(c). *Id.* at 160–61, 931 P.2d at 602–03. Thus, if an arrestee with no prior alcohol enforcement contacts during the five years predating the date of arrest consents to a blood test and fails, he or she may face revocation of his or her driving privileges from three months *up to one year. See* HRS §§ 286–261(b)(1) and (c).

Among other things, our implied consent statute is intended to provide an efficient means of gathering evidence of intoxication. *See Rossell v. City and County of Honolulu,* 59 Haw. 173, 181, 579 P.2d 663, 669 (1978). The statutory scheme, however, also protects the rights of the driver in that he or she may withdraw his or her consent before a test is administered. To this end, Hawai'i's implied consent scheme *mandates* accurate warnings to enable the driver to knowingly and intelligently consent to or refuse a chemical alcohol test.[7] *See Miller v. Tanaka,* 80 Hawai'i 358, 368, 910 P.2d 129, 139 (App.1995) ("The ADLRO has a duty to provide clear information regarding both the administrative and criminal proceedings faced by a defendant.") (Quoting *State v. Feldhacker,* 76 Hawai'i 354, 357, 878 P.2d 169, 172 (1994) (citing HRS § 286–254(a)(2)–(3)).). *See also Keefe v. Dept. of Licensing,* 46 Wash.App. 627, 731 P.2d 1161, 1164 (1987) ("The underlying purpose of the implied consent statute [is to provide] the automobile operator the opportunity of exercising an intelligent judgment concerning whether to exercise the statutory right of refusal.") (Quoting *State v. Whitman County Dist. Court,* 105 Wash.2d 278, 714 P.2d 1183, 1185

---

**6.** HRS § 286–255 further provides in pertinent part:

**Arrest; procedures.** (a) Whenever a person is arrested for a violation of section 291–4, on a determination by the arresting officer that:

. . . .

(2) There was probable cause to believe that the arrestee was driving, operating, or in actual physical control of the motor vehicle while under the influence of intoxicating liquor;

the arresting officer shall immediately take possession of any license held by the person and request the arrestee to take a test for concentration of alcohol in the blood. The arresting officer shall inform the person that the person has the option to take a breath test, a blood test, or both. *The arresting officer shall also inform the person of the sanctions under this part, including the sanction for refusing to take a breath or a blood test.* . . .

(Emphasis added.)

**7.** The dissent contends that the implied consent statute "expressly preordains 'consent[,]' " thereby characterizing the implied consent statute as eliminating a driver's implied right to refuse. Dissent at 56, 57–58, 987 P.2d at 279, 280–281. The dissent fails to acknowledge that a driver's implied consent is qualified by his or her implied right to withdraw consent based on accurate disclosure of the consequences of *both* consent and refusal. *See* HRS § 286–255. It is clear that a driver cannot knowingly and intelligently refuse, as the dissent would have it, without warnings regarding *both* the right of consent and refusal, and the consequences *of each. See State v. Whitman County Dist. Court,* 105 Wash.2d 278, 714 P.2d 1183, 1187 (1986) ("If an individual is informed that it is more likely that negative consequences will follow a certain decision, it seems obvious that more pressure is being brought to bear on the accused to make that decision which would avoid the negative consequences.").

(1986)); *Gonzales v. State,* 112 Wash.2d 890, 774 P.2d 1187, 1191 (1989) (accurate warnings mandated by the implied consent statute "must be given in order to afford the driver the opportunity to make a knowing and intelligent decision."); *State v. Terry,* 236 Ga. App. 248, 511 S.E.2d 608, 611 (1999) ("if the defendant is misled or misinformed as to his rights, his ability to make an informed decision would be impaired"); *State v. Bartels,* 112 Wash.2d 882, 774 P.2d 1183, 1184 (1989) ("the statutory requirement demonstrates an important protection of the subject's right to fundamental fairness which is built into our implied consent procedure") (citation omitted). The relevant inquiry in this case, therefore, is whether the warnings given by the arresting officer afforded Wilson the opportunity to make a knowing and intelligent decision whether to take an evidentiary blood alcohol test.

■ Other jurisdictions faced with this issue have established, in varying forms, the basic principle that, where a change in wording of the implied consent warnings operates to convey a different meaning than that specified in the statute, the driver cannot be held to have made a knowing and intelligent decision whether to submit to an evidentiary alcohol test. *See Cooper v. Dept. of Licensing,* 61 Wash.App. 525, 810 P.2d 1385, 1386 (1991) (Arresting officer's statement that Cooper's driver's license would be revoked "probably for at least a year, depending upon his driving record, maybe two" deprived Cooper the opportunity to make a knowing and intelligent decision whether to take the test. The officer's statement implied that his license might be revoked for less than a year where the state's implied consent statute required the revocation of a refusing arrestee's driver's license for a minimum of one year.); *Welch v. Department of Motor Vehicles,* 13 Wash.App. 591, 536 P.2d 172, 173 (1975) (warning that, upon refusal of alcohol test, driver *could* lose his license, rather than that driver *would* lose his license, failed to provide driver the opportunity of exercising an intelligent judgment under the implied consent statute); *State v. O'Donnell,* 225 Ga. App. 502, 484 S.E.2d 313 (1997) (because the arresting officer did not inform arrestee that he had the right to have another test done by a qualified person of his own choosing, the warning did not comply with the implied statute and, therefore, the results of driver's breath test were properly excluded from evidence in his DUI prosecution); *Whitman County Dist. Court,* 714 P.2d at 1187 (warning that results of breathalyzer test "shall be used against you in a subsequent criminal trial" rather than "may be used," as mandated by statute, deprived arrestees of the opportunity of exercising an intelligent judgment concerning whether to exercise the statutory right of refusal, requiring suppression of the test results); *Terry,* 511 S.E.2d at 611 (police officer's statement that obtaining a bond was a precondition to taking an independent test in contravention of the implied consent statute "in its totality contained substantial misleading, inaccurate, and extraneous information ... and [the driver] was confused thereby as to [her] existing implied consent statutory privileges") (some brackets in original); *Smith v. State of Nebraska, Department of Motor Vehicles,* 248 Neb. 360, 535 N.W.2d 694, 698 (1995) (because driver was not informed of both the consequences of consenting to and refusing a chemical alcohol test before consenting to a breath test, he "never had the opportunity to understand all of the statutory consequences of failing the breath test" and did not make a "rational and informed decision" whether to consent to the test); *Graves v. Commonwealth,* 112 Pa.Cmwlth. 390, 535 A.2d 707, 708–09 (1988) (warning that individual's license "could," rather than "would," be suspended upon failure to submit to a breath test "lack[ed] the specificity required to convey the mandatory nature of the suspension" and thus required reinstatement of driver's license); *Mairs v. Department of Licensing,* 70 Wash.App. 541, 854 P.2d 665, 668–69 (1993) (Because the advice given to an arrestee by a state trooper under the state's implied consent statute was "confusing and misstated the law[,] ... [the arrestee] did not make a knowing and intelligent decision on whether to take or refuse a test of the alcohol content of her blood." Accordingly, because "the information conveyed confuse[d] the driver about his rights under the statute, [he] may claim that he had no rea-

sonable opportunity to refuse."); *Beem v. State*, 119 Idaho 289, 805 P.2d 495, 498 (App. 1991) (because driver had "the right to be correctly advised by the officer of the true consequences of refusing to take the blood-alcohol test," warning that stated that license would be suspended for 120 days, rather than 180 days, failed to correctly advise driver of his rights under implied consent statute); *Buchanan v. Registrar, Ohio Bureau of Motor Vehicles*, 85 Ohio App.3d 263, 619 N.E.2d 523, 526 (1993) (omission of the fact that "a person whose license was suspended must show proof of financial responsibility and must pay a $125 reinstatement fee" on the implied consent form rendered the form an inaccurate statement of the law, thereby necessitating driver's license suspension to be set aside); *Biddlecome v. Conrad*, 249 Neb. 282, 543 N.W.2d 170, 172 (1996) (because warnings omitted various consequences of both consenting to and refusing chemical alcohol test, and because motorist cannot "understand information that [was] never conveyed," motorist was unable to make a "rational and informed decision" whether or not to consent to a chemical alcohol test); *Bennett v. Director of Revenue*, 889 S.W.2d 166, 171 (Mo.App.1994) (officer's failure to give driver mandatory warning that her license "shall be immediately revoked upon her refusal" rendered her decision on whether to refuse uninformed); *State v. Krieg*, 7 Wash.App. 20, 497 P.2d 621, 625 (1972) (failure to give warnings contained in implied consent statute did not adequately apprise driver of his right to withdraw his consent, necessitating the suppression of the results of the breathalyzer test in his negligent homicide prosecution); *State v. Sells*, 798 S.W.2d 865, 867 (Tex.App.1990) (officer's warning that driver "would automatically be charged and incarcerated" upon refusal to take a chemical test was a misstatement of the law and required suppression of driver's

test results); *Perrine v. State of Nebraska, Department of Motor Vehicles*, 249 Neb. 518, 544 N.W.2d 364, 367 (1996) (Warnings were "inadequate and misleading" where they failed to advise driver of mandatory consequences of consenting to or refusing chemical alcohol test. It was therefore plain error for the director of the department of motor vehicles to revoke driver's license.).

■ For purposes of this opinion, we assume that Wilson had no "prior alcohol enforcement contacts during the five years preceding the date of arrest,"[8] and, thus, pursuant to our interpretation of HRS § 286–261(b) in *Gray*, Wilson was subject to revocation of his driving privileges for three months to a year by consenting to and failing a blood test. *See supra* note 4. However, the "form" read to Wilson by the arresting officer stated only that a "three month revocation ... would apply if you chose to take the test and failed it." It did not inform Wilson that his license may be revoked for up to one year. Therefore, insofar as the arresting officer's statement stated that the revocation period for someone with a "clean" record who consents and fails was only three months, it was inaccurate and misleading and did not fully inform Wilson of the legal consequences of submitting to a blood test. Not only was the information given to Wilson misleading, it was relevant to his decision whether to agree to or refuse the blood alcohol test.[9] Thus, although Wilson elected to take the test, he did not make a knowing and intelligent decision whether to exercise his statutory right of consent or refusal. *See Whitman County Dist. Court*, 714 P.2d at 1187 (where a warning "contains a more coercive impact than that required by statute[,]" such a warning could mislead a driver into taking the Breathalyzer test, de-

**8.** The record contains no evidence supporting or refuting Wilson's representation of himself as a first-time offender, but we accept this self-portrayal as accurate for purposes of this opinion.

**9.** The dissent disingenuously claims that, given the "the obvious consequences of taking and failing a blood-alcohol test," Wilson cannot now plead ignorance of the immediate administrative

consequences of an alcohol test over the legal limit. *See* dissent at 60, 987 P.2d at 283 (citation omitted). The dissent misses the point. In no way do we imply that Wilson was ignorant of *any* consequences of taking and failing an evidentiary blood alcohol test. The point is that the lack of accurate warnings of the difference in penalties affected Wilson's ability to make a knowing and intelligent decision whether to consent to or refuse a blood test.

priving the driver of knowing and intelligent consent).

■ The prosecution contends, however, that the sanctions under ADLRO are inapplicable in criminal proceedings for DUI. On the contrary, while the proceedings are conducted separately, the administrative driver's license revocation process under HRS chapter 286 is materially and inextricably related to a criminal prosecution for DUI under HRS § 291-4. Indeed, under our drunk driving statutory scheme, "[i]f criminal charges are filed currently with the administrative charges, *the State will share. all its evidence with the county prosecutor.*" Sen. Conf. Comm. Rep. No. 137, in 1990 Senate Journal, at 826. Moreover, while this court has held that an administrative license revocation proceeding based on DUI is not a bar to a subsequent criminal prosecution, *see State v. Toyomura,* 80 Hawai'i 8, 17, 904 P.2d 893, 902 (1995), and that the possible penalties imposed by the two proceedings differ, *see Gray,* 84 Hawai'i at 146 n. 14, 931 P.2d at 604 n. 14, the administrative revocation statute and its criminal DUI counterpart are part and parcel of the same statutory scheme to prevent and address drunk driving. *See State v. Feldhacker,* 76 Hawai'i 354, 357, 878 P.2d 169, 172 (1994) ("the Administrative Revocation Program was designed to co-exist with criminal DUI prosecution."); *Toyomura,* 80 Hawai'i at 17, 904 P.2d at 902 ("the main benefit of administrative revocation is that it allows the State to remove a drunk driver's license before the culmination of a lengthy prosecution under the criminal statute") (citing Hse. Conf. Comm. Rep. No. 137, in 1990 House Journal, at 824; Sen. Conf. Comm. Rep. No. 137, in 1990 Senate Journal, at 825); *Kernan v. Tanaka,* 75 Haw. 1, 17, 856 P.2d 1207, 1216 (1993) ("Administrative revocation begins when a police officer stops a motorist suspected of DUI, arrests him or her, and takes possession of the arrestee's driver's license, giving the arrestee notice of the revocation action.").

■ The only method for the police to obtain samples of a driver's blood alcohol level in a criminal DUI prosecution is through an evidentiary blood, breath, or urine test taken in accordance with the statutory requirements. It cannot be the intent of the implied consent statute to allow a blood sample to be taken in violation of its terms, to suppress it in the driver's administrative revocation proceeding as being violative of the law, and then to allow its admission in the driver's corresponding criminal DUI prosecution because there was no infirmity in its acquisition. Thus, contrary to the dissent's characterization, the arresting officer's failure to inform Wilson of the applicable statutory penalties upon arrest is unquestionably relevant to Wilson's criminal DUI prosecution. *See State v. Moylett,* 313 Or. 540, 836 P.2d 1329, 1333 (1992) (blood test evidence obtained from an arrestee in violation of Oregon's implied consent statute is inadmissible in the arrestee's DUI prosecution); *Bartels,* 774 P.2d at 1186 (en banc) ("when the State has interfered with a driver's opportunity to make an intelligent judgment whether to submit to a blood alcohol test, we have suppressed test results" in corresponding criminal prosecutions) (citations omitted); *State v. Berry,* 121 N.H. 324, 428 A.2d 1250, 1252 (1981) (provisions of New Hampshire's implied consent law apply to "any offense arising out of acts alleged to have been committed while the person was driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor") (citation omitted); *Krieg, supra* (where the prosecution cannot establish that adequate warnings were given to the accused prior to administering an evidentiary breath test, the remedy is the suppression of the breath test results); *Whitman County Dist. Court,* 714 P.2d at 1185 (where the driver submits to an evidentiary breath test, the issue in both criminal and administrative contexts is the same).[10]

Our implied consent statute is worded in the mandatory; therefore, police officers

---

**10.** This court has previously indicated that the exclusion of evidence based on a statutory violation is proper under appropriate circumstances. *See Pattioay,* 78 Hawai'i at 467, 896 P.2d at 923 (evidence obtained in violation of the Posse Com- itatus Act, a federal statutory law providing a penalty of its own, may result in the suppression of evidence in a state court criminal proceeding even absent a constitutional violation). Such exclusion is appropriate here.

have an affirmative duty to clearly and accurately inform drivers of their implied right to consent or refuse, together with the consequences of each. *See generally Gray*, 84 Hawai'i at 151, 931 P.2d at 593 (defining "shall" in the words of a statute to mean "has a duty to"). Although the dissent apparently agrees that "the officer did not fully educate Wilson on the consequences of consent," dissent at 60, 987 P.2d at 283, it nevertheless deems unnecessary "rote compliance with the statutory requirements." Dissent at 59 n. 5, 987 P.2d at 282 n. 5. In this manner, the dissent minimizes the importance of accurate statutorily-mandated warnings and the effects of the police officer's failure to properly provide those warnings.[11] Under the dissent's analysis, whether or not the warnings given by police are accurate—and correspondingly, whether or not the driver made a knowing and intelligent decision—the police can nonetheless compel the test results in the driver's DUI prosecution. If we were to adopt the dissent's position, a police officer could give a driver arbitrary, false, or misleading information regarding a driver's rights under the implied consent law and still compel the admission of the results in the

criminal context. Clearly, that cannot be the intended result of our implied consent statute.[12]

It would be anomalous, moreover, to order Wilson's illegally obtained blood sample suppressed in his driver's license revocation hearing and simultaneously admit it in his related criminal prosecution for DUI, a proceeding requiring higher procedural requirements and safeguards and carrying with it penal consequences and constitutional ramifications. *See, e.g., State v. Lau*, 78 Hawai'i 54, 61, 890 P.2d 291, 298 (1995) (in DUI prosecution under HRS § 291-4, an arrestee faces the possibility of imprisonment under the statute's penalty provisions).

■■■■ This court recognizes and embraces the important purpose of our implied consent laws to prevent fatalities and injuries resulting from highway traffic accidents.[13] This purpose, however, can be realized while at the same time ensuring that the police provide clear, accurate warnings as mandated by statute. We hold, therefore, that the arresting officer's violation of HRS chapter 286's consent requirement precludes admissi-

11. The dissent characterizes the difference between Wilson's refusal or consent as a "Hobson's choice at best." Indeed, for the dissent, the "difference between three months and a year [did not] materially alter[ ] the balance of options faced by Wilson[.]" Dissent at 60, 987 P.2d at 283. To the contrary, the difference between revocation for three months and one mandatory year is a substantive one. This variance in penalty thus constituted a substantial difference in the implied consent warning, affecting Wilson's decision. *See Cooper*, 810 P.2d at 1386 (warning that driver's license would be revoked "probably for at least a year, depending upon his driving record, maybe two" versus a mandatory minimum of one year violated implied consent statute); *Welch*, 536 P.2d at 173 (warning that driver "could" lose his license rather than "would" lose his license violated implied consent law); *Whitman County Dist. Court*, 714 P.2d at 1188 (warning that refusal "shall be used against you in a subsequent criminal trial," rather than "may be used," as mandated by statute, violated implied consent statute). *But see State v. McGraw*, 237 Ga.App. 345, 514 S.E.2d 34, 36 (1999) (police officer's use of the word "test," rather than "tests," "indicates" instead of "indicate," and "a point one-oh grams" rather than "zero point one zero grams," do not constitute a substantive

change in the implied consent notice warranting suppression of arrestee's blood test results).

12. Similarly, the dissent excuses the police from the statutory obligation to state accurately the statutorily-mandated warnings. Using the dissent's analysis, there is no incentive for the police to impart accurate information, thereby rendering our implied consent statute virtually meaningless. *Cf. Cooper*, 810 P.2d at 1387 ("If law enforcement officers know that courts will hold them to a strict standard of accuracy, then they are more likely to phrase their advice in the language of the statute.").

13. The dissent is preaching to the choir when it notes that "prevention of fatalities, injuries damages and losses resulting from highway traffic accidents" is an important and significant purpose of our implied consent laws. We cannot agree, however, that our holding today "negates the purpose" of both the implied consent law and the criminal DUI statute. To the contrary, our holding simply insures that an arrestee is able to make a knowing and intelligent choice whether to submit to an evidentiary alcohol test based on accurate warnings. It can hardly "negate the purpose" of the statute or create an onerous burden on the police to require an accurate warning prior to administering a blood, breath, or urine test.

bility of Wilson's blood test results in his related criminal DUI proceeding.[14]

## IV. *CONCLUSION*

For the foregoing reasons, we therefore hold that, because the information conveyed to Wilson regarding his rights under HRS chapter 286 was inaccurate and misleading, Wilson was precluded from knowingly and intelligently consenting to the blood alcohol test in violation of HRS chapter 286. Accordingly, we affirm the district court's order granting Wilson's motion to suppress the blood test results in his criminal DUI prosecution.

Dissenting Opinion by NAKAYAMA, J., with whom RAMIL, J., joins.

The majority holds that the failure of the arresting officer to inform Wilson of the possibility of discretionary revocation from three months to a year if he consented to a blood-alcohol test and failed it precludes the admission of the test results in his criminal trial for driving under the influence (DUI), Hawai'i Revised Statutes (HRS) 291–4 (1993). I cannot agree that such an omission warrants the remedy of suppression. Accordingly, I dissent.

### I. *The Scope of the Exclusionary Rule*

We have recognized the general rule that:
A defendant who seeks to benefit from the protections of the exclusionary rule has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also that his own *constitutional rights* were violated by the search and seizure challenged.

*State v. Pattioay,* 78 Hawai'i 455, 466, 896 P.2d 911, 922 (1995) (quoting *State v. Scanlan,* 65 Haw. 159, 160–61, 649 P.2d 737, 738 (1982)) (emphasis added). *See also Rossell v. City and County of Honolulu,* 59 Haw. 173, 187, 579 P.2d 663, 672 (1978) (maintaining that "where evidence has been obtained in violation of a statute, that evidence is not

inadmissible per se in a criminal proceeding unless the statutory violation has constitutional dimensions").

In rare cases, however, we have applied the exclusionary rule to evidence obtained in violation of statutes or rules. *See Pattioay, supra* (excluding evidence obtained in violation of the Posse Comitatus Act, a federal statute); *State v. Kirn,* 70 Haw. 206, 767 P.2d 1238 (1989) (holding that results of intoxilizer test lacked proper foundation for admission because the test was conducted contrary to procedure stated in the administrative rules). This exception does not apply to any and every violation of statute or rule. *See Pattioay,* 78 Hawai'i at 468–69 n. 28, 896 P.2d at 924–25 n. 28 (adopting a rule of "necessity" in determining whether a nonconstitutional violation warrants suppression). As emphasized by the concurring opinion in *Pattioay,*

> when government agents obtain evidence of a crime without violating any constitutional rights, *the exclusionary rule should only be applied in very limited situations.* . . . [T]he violation of *any* law by a government agent simply does not provide a sufficiently narrow category for invoking an exception to the exclusionary rule. Rather, we must approach these situations on a *case-by-case basis to determine whether the rationales underlying the exclusionary rule are served, and whether the law violated warrants its application.*

*Id.* at 470–71, 896 P.2d at 926–27 (Ramil, J., and Moon, C.J., concurring) (some emphasis in original and some added).

In *Pattioay,* this court suppressed evidence obtained in violation of the Posse Comitatus Act, 18 United States Code (U.S.C.) § 1385 (1988), a federal statute prohibiting military involvement in civilian law enforcement. *See* 78 Hawai'i at 460–62, 896 P.2d at 916–18. Although the challenged action did not violate any constitutional rights, *see id.* at 466, 896 P.2d at 922, we recognized that courts have "inherent supervisory power to

---

**14.** We note that there is nothing to prevent the prosecution from relying on other relevant evidence of intoxication in order to prosecute Wilson for the criminal offense of DUI, e.g., the manner in which Wilson was observed to have

driven his vehicle, his conduct in performing the requisite alcohol tests, his appearance, demeanor, and other valid police observations of signs of intoxication.

curb abuses and *promote . a fair process* which extends to the preclusion of evidence." *Id.* at 468 n. 28, 896 P.2d at 924 n. 28 (citing *Richardson v. Sport Shinko,* 76 Hawai'i 494, 507, 880 P.2d 169, 182 (1994)) (emphasis added). Consequently, we held that the illegally obtained evidence "must be suppressed under the authority of this court's supervisory powers in the administration of criminal justice in the courts of our state." *Id.* at 469, 896 P.2d at 925. We noted, however, that "the critical question [wa]s whether the power to exclude evidence [wa]s *reasonably necessary* to vindicate the court's authority." *Id.* at 469 n. 28, 896 P.2d at 925 n. 28 (emphasis and brackets added). *See also id.* at 471–73, 896 P.2d at 927–29 (concurring opinion) (focusing on historical dangers and fears of military involvement in civilian affairs to justify suppression).

## II. *The Exclusionary Rule Does Not Apply In This Case*

It is long-settled that a blood-alcohol test performed as an incident to a lawful arrest for DUI, based on clear indication of intoxication, and in a reasonable, medically approved manner, does not violate any constitutional rights. *See Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Rossell,* 59 Haw. at 187, 579 P.2d at 672 (recognizing the "constitutional propriety" of blood alcohol tests under *Schmerber* ).[1] The arresting officer in this case, however, failed to fully comply with the notice requirements of the "implied consent" statute, HRS chapter 286, part VII (1993 and Supp.1998). The question is whether the omission in dispute, the difference between three months and a year of discretionary revocation for consenting to a blood–alcohol

test and failing it, falls within the narrow exception to the rule limiting the suppression remedy to constitutional violations. I do not believe it does. First, neither the letter nor intent of the implied consent statute provides for the exclusion of constitutionally obtained evidence in criminal DUI prosecutions. Second, the principles underlying the exclusionary rule do not warrant the suppression of evidence in this case.

### A. *The "Implied Consent" Statute Does Not Provide For The Exclusion Of Evidence In Criminal DUI Prosecutions*

As suggested by its name, the "implied consent" statute begins with the premise that all persons driving on the public highways of this state have consented to a blood, breath, or urine test pursuant to the statutorily prescribed procedure. *See* HRS § 286–151(a) (Supp.1998). The statute also mandates that the arresting officer inform the arrestee of the sanctions under the administrative revocation statute. *See* HRS § 286–151(b); HRS § 286–255(a) (Supp.1998). Preoccupied solely with the latter provisions, the majority examines the effect of the officer's alleged noncompliance with the statutory notice requirements on the "voluntariness" of Wilson's consent. This inquiry of whether consent was "voluntary and intelligent," usually conducted in the constitutional context, *see, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (voluntariness of consent to search); *State v. Ganal,* 81 Hawai'i 358, 917 P.2d 370 (1996) (same), makes little sense in the present situation, where the statute expressly preordains "consent." *See State v. Newton,* 291

---

1. In *Schmerber,* a physician withdrew a blood sample from a DUI arrestee at the request of the arresting officer, despite the arrestee's refusal to consent based on advice of counsel. *See* 384 U.S. at 758–59, 86 S.Ct. 1826. The United States Supreme Court, through the late Mr. Justice Brennan, held that the usual requirement of a search warrant did not apply given the "emergency" presented by the fleeting nature of the evidence and the reasonableness of the test as an indicator of blood-alcohol content, and where the test was performed in a reasonable manner, *i.e.,* "taken by a physician in a hospital environment according to accepted medical practices." *Id.* at

770–71, 86 S.Ct. 1826. The Court further conditioned such tests on the arresting officer having, in addition to the probable cause necessary for the arrest, "a clear indication that in fact [the] evidence [sought after] will be found." *Id.* at 769–70, 86 S.Ct. 1826.

In this case, Wilson does not allege, and the record does not indicate, an absence of probable cause for the arrest or clear indication of intoxication. Additionally, Wilson does not dispute, nor does the record call into question, the reasonableness of the blood test or the manner in which it was administered.

Or. 788, 636 P.2d 393, 398 (1981) ("Thus[,] refusal as contemplated by the statute is something other than withholding of consent because consent is legally implied. It is a refusal to comply with the consent which has already been given as a condition of a license to drive."). The majority ignores, for example, that the implied consent law allows police officer to administer a blood-alcohol test on drivers "dead, unconscious, or in any other state which renders the person *incapable of consenting*" to the test. *See* HRS § 286–154 (1993) (emphasis added).

At minimum, the apparent contradiction in analyzing the voluntariness of consent previously established by law compels further inquiry into the purpose of the implied consent statute. *See* HRS § 1–15(2) (1993). As this court previously explained in *Rossell v. City and County of Honolulu,* 59 Haw. 173, 579 P.2d 663 (1978):

> Our Legislature enacted the implied consent statute as one means of decreasing fatalities, injuries, damages and losses resulting from highway traffic accidents. § 1, c. 214, S.L.H.1967. The implied consent statute represents "an *additional or alternative method* of compelling a person arrested for drunken driving to submit to a test for intoxication, by providing that such person will lose his automobile driver's license for a period of six months if he refuses to submit to a test for intoxication." *People v. Superior Court,* 6 Cal.3d 757, 765, 100 Cal.Rptr. 281, 286, 493 P.2d 1145, 1150 (1972) (en banc).
>
> Although *Schmerber* holds that there is no Constitutional impediment to the forcible removal by the state of a blood sample from an arrestee who refuses to consent, provided that the taking is done in a reasonable, medically approved manner, "such an episode remains an unpleasant, undignified and undesirable one." *People v. Supe-*

*rior Court,* 6 Cal.3d at 764, 100 Cal.Rptr. at 286, 493 P.2d at 1150. Thus, a state is free to seek *alternative means to avoid violent police-citizen confrontations,* and can "decide to use the threat of revocation (of a driver's license) to encourage submission to the search *as an alternative to the use of force.*" Comment, *The Theory and Practice of Implied Consent in Colorado,* 47 Colo. L.Rev. 723, 762 (1976). It cannot be overstated that the effect of implied consent legislation "is to equip peace officers with an instrument of enforcement not involving physical compulsion." *People v. Superior Court,* 6 Cal.3d at 765, 100 Cal.Rptr. at 286, 493 P.2d at 1150 (emphasis added).

HRS § 286–155 (1976 Repl.) constitutes a valid element of Hawaii's *statutory scheme of encouraging submission to chemical sobriety testing without resort to physical force* on the part of the police. In order to fulfill this statutory scheme, it is essential that the police refrain from imposing the chemical tests when the arrested driver refuses to submit to such tests.

> The obvious reasons for acquiescence in the refusal of such a test by a person who as a matter of law is "deemed to have given his consent" is to avoid the violence which would often attend forcible tests upon recalcitrant inebriates.

*Bush v. Bright,* 264 Cal.App.2d 788, 790, 71 Cal.Rptr. 123, 124 (1968).

*Id.* at 181–82, 579 P.2d at 669 (emphasis added). In short, we recognized the implied consent statute's underlying purpose of securing blood-alcohol evidence through an *additional or alternative* means, replacing the potential for violent confrontation and the danger, though not the legitimate option, of *physical coercion* under *Schmerber*[2] with the *legal threat* of mandatory license revocation.

---

2. The *Schmerber* Court carefully limited its holding to the facts of the case. *See* 384 U.S. at 771, 86 S.Ct. 1826 ("That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions."). *Schmerber* does not allow officers to forcibly restrain an unwilling arrestee and extract his or her blood. *See id.*

at 760 n. 4, 86 S.Ct. 1826 ("It would be a different case if the police initiated the violence, refused to respect a reasonable request to undergo a different form of testing, or responded to resistance with inappropriate force."). *Cf. Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1951) (holding that the forcible extraction of suspect's stomach contents through induced vomiting violated the Due Process Clause); *Winston v. Lee,* 470 U.S. 753, 105 S.Ct.

Several observations follow from this understanding. First, to the extent that the implied consent statute offers arrestees mandatory revocation for refusal, or possible production of incriminating evidence and revocation nevertheless for compliance—a Hobson's choice at best—it does not reconstruct the right of "voluntary and intelligent" choice already denied in *Schmerber* and in the statute itself. Rather, as a concession to the arrestee's physical ability to resist, the statute merely aims to "persuade" arrestees to peaceably submit to blood-alcohol tests. Indeed, as noted previously, in the case of dead, unconscious, or incapacitated defendants, the statute does not require "consent" at all. *See* HRS § 286–154. By focusing on the "voluntariness" of Wilson's consent, therefore, the majority fundamentally misconstrues the meaning and purpose of "implied consent." *See Bush*, 71 Cal.Rptr. at 125 ("It is firmly established that a drunken driver has no *right* to resist or refuse such a test. It is simply because such a person has the *physical power* to make the test impractical, and dangerous to himself and those charged with administering it, that it is excused upon indication of his unwillingness." (Emphasis in original.)); *Newton*, 636 P.2d at 398 ("The purpose of a warning of license suspension . . . . is not to reinstate a right to choice, but rather to nonforcibly enforce the driver's previously implied consent."); *State v. Spencer*, 305 Or. 59, 750 P.2d 147, 153 (1988) ("Consent being implied by law, a driver may not legally refuse. A driver, however, can *physically* refuse to submit, and the implied consent law, recognizing that practical reality, forbids the use of physical force to compel submission." (Emphasis in original.)); *State v. Woolery*, 116 Idaho 368, 775 P.2d 1210, 1214 (1989) ("The [legislature] has acknowledged a driver's *physical ability to refuse* to submit to an evidentiary test, but it did not create a *statutory right* for a driver to withdraw his previously given consent[.]" (Emphasis in original.)); *State v. Sisler*, 114 Ohio App.3d 337, 683 N.E.2d 106, 109 (Ct. App.1995) ("[The implied consent statute] does not create a right of refusal or expand on the constitutional guarantees afforded a criminal accused.").

Furthermore, just as the statutory alternatives do not resurrect a right of choice, the statutory notice requirements do not impose limitations on criminal DUI prosecutions not otherwise secured by the constitution. The majority's rote emphasis on the terms of the statutory notice provisions fails with the realization that the suppression remedy sought by Wilson and granted by the majority appears nowhere in the statute. The majority thus inquires, as it must, into the statute's purpose, but offers nothing more than the assertion that, insofar as "the administrative revocation statute and its criminal DUI counterpart are part and parcel of the same statutory scheme to prevent and address drunk driving," violation of the former's notice requirements precludes use of the evidence in the latter. *See Majority* at 52, 987 P.2d at 275. Neither the letter nor the purpose of the statute supports this *ipse dixit*. This court, to the contrary, has consistently recognized the functional distinctions between administrative revocation and criminal DUI prosecution. In *State v. Uehara*, 68 Haw. 512, 515, 721 P.2d 705, 706–07 (1986), we explained:

> Although the implied consent statute is intended to facilitate the enforcement of the DUI statute, *Rossell*, 59 Haw. at 181, 579 P.2d at 669, they are separate and distinct and should be enforced separately. A DUI violation is a criminal offense, *see State v. O'Brien*, 5 Haw.App. 491, [497], 704 P.2d 905, 911, *aff'd*, 68 Haw. [38], 704 P.2d 833 [883] (1985), whereas an implied consent violation is "*civil* in nature, and hearings before a district judge, pursuant to statute, are in the nature of administrative proceedings." (Emphasis in original). *State v. Severino*, 56 Haw. 378, 380, 537 P.2d 1187, 1189 (1975); *see also State v. Gustafson*, 54 Haw. 519, 520, 511 P.2d 161, 162 (1973). Furthermore, the penalties for refusing to submit to testing are "additional penalties and not substitutes for other penalties provided by law." HRS § 286–155 (Supp.1984).

1611, 84 L.Ed.2d 662 (1985) (holding that surgery without the suspect's consent, for the purpose of extracting a bullet from the suspect's body, violated the fourth amendment).

*Id.* at 515, 721 P.2d at 706–07 (1986). *See also Woolery*, 775 P.2d at 1215 ("[The revocation statute] is devoted entirely to the administrative, or civil, suspension of the license of a driver. This section does not in any way discuss criminal offenses related to driving under the influence of alcohol.").

In enacting its comprehensive "highway safety program," codified in HRS chapter 286, the legislature stated as its "declaration of purpose:"

> Deaths of persons and injuries to them and damage to property with the other losses suffered on account of highway traffic accidents are of grave concern to the State and its citizens.... The legislature finds and declares that it is in the public interest that the State initiate, coordinate and accelerate every available means to decrease the fatalities, injuries, damages and losses resulting from highway traffic accidents.

1967 Haw. Sess. L. Act 214, § 1 at 257. *See also State v. Bostrom*, 127 Wash.2d 580, 902 P.2d 157, 160–61 (1995) (en banc) (identifying the "three objectives" of the implied consent statute as: 1) discouraging individuals from driving while intoxicated; 2) removing driving privileges from those disposed to drunk driving; and 3) providing an efficient means of gathering reliable evidence of intoxication or nonintoxication). Nothing in the legislative history contemplates the use of the notice requirements of the implied consent subsection of this law as a restriction on criminal DUI prosecutions. By sanctioning such a use in this case, the majority stands the entire "statutory scheme to prevent and address drunk driving" on its head. The majority negates the purpose of both laws as a result. *See State v. Zielke*, 137 Wis.2d 39, 403 N.W.2d 427, 434, *reconsideration denied*, 145 Wis.2d 893, 434 N.W.2d 786 (1987) ("[T]he implied consent law is an important weapon in the battle against drunk driving in this state. Neither the law, its history nor common sense allows this court to countenance its use as a shield by the defense to prevent constitutionally obtained evidence from being admitted at trial."); *State v. McGuire*, 493 So.2d 559, 563 (La.1986) ("The sanction of inadmissibility is neither statutorily nor constitutionally compelled [in criminal DUI prosecutions]."); *State v. Baker*, 502 A.2d 489, 495 (Me.1985) ("[W]e cannot find any implicit legislative intention that reliable blood test results must be excluded because the test was administered after defendant's refusal, although in conformity with constitutional requirements."); *Woolery*, 775 P.2d at 1215 ("Rather than condone a physical conflict, the legislature provided for the administrative revocation of the license of an individual who refuses to comply with his previously given consent. Such legislative acknowledgment was not meant to hamstring the ability of law enforcement to properly investigate and obtain evidence of serious crimes committed by those individuals who have chosen to drink and then drive.").[3]

In sum, the suppression remedy granted by the majority finds no basis in statute. The arresting officer's warning in this case fulfilled the statute's purpose by enabling the officer to obtain important and accurate evidence[4] through nonviolent means. *Cf. State v. Abrahamson*, 328 N.W.2d 213, 215 (N.D. 1982) ("[The implied consent statute] does not apply when a person voluntarily submits to the extraction of a blood specimen."). The implied consent law neither creates a right of voluntary choice, nor does it condition the admissibility of test evidence in criminal DUI prosecutions on compliance with the statutory notice requirements. The suppression of Wilson's test results in this case, in fact, contravenes the statute's purpose of enhancing, rather than limiting, the State's powers to prevent drunk driving.

B. *The Principles Underlying The Exclusionary Rule Do Not Warrant The Suppression Of Evidence In This Case*

Even apart from the issue of the purpose and operation of the implied consent statute's notice requirements, the officer's omission in

---

3. Most of the decisions cited in voluble succession by the majority, *see* Majority at 50–51, 987 P.2d at 273–274, address only the admissibility of evidence in civil revocation proceedings.

4. Defendants in criminal DUI cases, I note, have an equal interest in reliable evidence of intoxication.

this case simply does not amount to the sort of violation requiring the remedy of suppression. As discussed in Part I, *supra*, the court applies the exclusionary rule to nonconstitutional violations only when "reasonably necessary" to uphold the court's authority to promote a fair process. *See Pattioay*, 78 Hawai'i at 469 n. 28, 896 P.2d at 925 n. 28. The proper approach, therefore, is not the inflexible rule adopted by the majority, demanding "clear, accurate warnings as required by statute," *see* Majority at 53, 987 P.2d 276, but a case-by-case analysis guided by fundamental notions of fairness and due process.[5]

Along these lines, the United States Supreme Court's decision in *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), is particularly instructive. In *Neville*, the defendant alleged, *inter alia*, a due process violation based on the failure of the arresting officer to inform him that evidence of his refusal of a blood-alcohol test could be used against him at trial. *See id.* at 564, 103 S.Ct. 916. The Court rejected his argument, emphasizing that the officer made no *"misleading implicit assurances* as to the relative consequences of his choice." *Id.* at 565, 103 S.Ct. 916 (emphasis added). The Court reasoned:

> [T]he officers specifically warned respondent that failure to take the test could lead to loss of driving privileges for one year. It is true the officers did not inform respondent of the further consequence that evidence of refusal could be used against him in court, but we think it unrealistic to say that the warnings given here implicitly assure a suspect that no consequences other than those mentioned will occur. Importantly, the warning that he could lose his driver's license *made it clear that refusing the test was not a "safe harbor,"* free of adverse consequences.

While the State did not actually warn respondent that the test results could be used against him, we hold that *such a failure to warn was not the sort of implicit promise* to forego use of evidence *that would unfairly "trick" respondent* if the evidence were later offered against him at trial.

*Id.* at 566, 103 S.Ct. 916 (emphasis added) (footnote omitted).

Similarly, in *Bostrom, supra*, the Washington supreme court held that the State's failure to give *any* warning of the possibility of administrative revocation as a consequence of consenting to a blood-alcohol test and failing it did not violate the due process rights of those who subsequently consented to the test. *See* 902 P.2d at 161–62. Relying on *Neville*, the *Bostrom* court explained:

> The warnings offered *no implicit assurances which could mislead* either the Respondents who refused the test or those who took the test.... [M]ost, if not all, drivers are well aware that if they agreed to the test and the results reveal a breath alcohol concentration higher than the legal limit, there would be adverse consequences both criminal and administrative.

*Id.* at 162 (emphasis added.)

In the instant case, the arresting officer correctly stated the mandatory administrative penalties for refusing to take the test. The officer also warned Wilson of the possibility of administrative revocation if he consented to the test and failed it. The officer even apprised Wilson that "criminal charges under [HRS § 291–4] may be filed." Nevertheless, because the officer neglected to explain that, pursuant to *Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 931 P.2d 580 (1997), Wilson faced the *possibility* of revocation for a period *between three months and a year* if he consented to the

5. The following discussion answers the majority's accusation that "[i]f we were to adopt the dissent's position, a police officer could give a driver arbitrary, false, or misleading information regarding a driver's rights under the implied consent law[.]" Majority at 54, 987 P.2d at 277. The point is not that no protections against arbitrary police action exist, but that the protections that do exist arise from basic due process considerations rather than from rote compliance with the statutory notice requirements. Nowhere in its opinion does the majority address the analysis of the *Pattioay* decision, or explain why the supposed statutory violation in this case falls within the exception to the general rule limiting the suppression remedy to constitutional violations. *See* Majority at 52, n. 10, 987 P.2d at 275, n. 10 (deciding, without discussion, that "[s]uch exclusion is appropriate here").

test and failed it, the majority holds that the notice was fatally defective.

I do not believe that the principles underlying the exclusionary rule are concerned with such an omission. Unlike the *Bostrom* case, where the officer made no mention of the possibility of administrative revocation as a consequence of consent, the officer here did inform Wilson of that prospect. Indeed, insofar as the officer's statement—"one year instead of three months [if you consent and fail]"—did not explain that the administrative penalty for consenting to the test and failing was discretionary, *i.e.*, that the director could revoke a non-refusing arrestee's license for less than three months, or not at all, the statement could have weighted Wilson's choice against consent and towards refusal. Wilson has *never* asserted that he would have refused the test had he received a full explanation of the penalties under *Gray. See Abrahamson*, 328 N.W.2d at 217 (noting that defendant "did not testify that he would have refused but for the officer's statement"). Moreover, in my view, he could not credibly do so, given the sufficiently undesirable and obvious consequences of taking and failing a blood-alcohol test. *See Bostrom*, 902 P.2d at 162 ("Amidst this climate of public intolerance for drunk driving, we cannot accept the contention that the implied consent warnings somehow misled the [arrestees] into believing that there could be no immediate administrative consequence for a breath test over the legal limit.").[6] Where the legislature enacts the statute in order to avoid *violent confrontation* and *physical coercion* between officers and refusing arrestees, I have difficulty accepting that the difference between three months and a year materially altered the balance of options faced by Wilson and somehow "tricked" or "coerced" him to consent. *See id.* ("There is no requirement that each and every specific consequence of [the choice] be enunciated."); *Frank v. De-*

*partment of Licensing*, 71 Wash.App. 585, 859 P.2d 1248, 1250 (1993) (inquiring, beyond the mere fact of inaccurate notice, whether "prejudice" resulted therefrom—"whether the inaccurate information may have encouraged [the arrestee] not to take the Breathalyzer test"); *State v. Helm*, 633 P.2d 1071, 1076–77 (Colo.1981) (holding that failure to inform arrestee of his right to refuse blood-alcohol test did not render his consent involuntary: "[T]here is no evidence that the police officer made promises or used tactics which overbore the will of the defendant ... or attempted to deceive the defendant.").

Although the officer did not fully educate Wilson on the consequences of consent, the officer's omissions by no means amounted to "misleading implicit assurances as to the relative consequences of [Wilson's] choice," inducing Wilson to believe that consent to the test offered a " 'safe harbor,' free of adverse consequences." *Neville*, 459 U.S. at 565, 103 S.Ct. 916. This case does not present the scenario in which an officer unfairly misleads or "tricks" an arrestee. Consequently, the principles of fairness and due process underlying the exclusionary rule do not require the suppression of Wilson's test results.

III. *Conclusion*

For the reasons stated above, I respectfully dissent. I would reverse the district court's suppression order on grounds that neither the implied consent statute nor the principles underlying the exclusionary rule warrant the suppression of the blood-alcohol test results in this case.

---

**6.** Although the majority cites extensively from case law from the State of Washington to support its position, the Washington implied consent stat-

ute has never required police officers to inform arrestees of the consequences of consent. *See id.* at 160–61.